UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
                                                        :
GT COMMODITIES,                                         :
                                                        :
                                    Petitioner,         :        24 Civ. 8499 (LGS)
                    -against-                           :
                                                        :        OPINION & ORDER
IXM S.A.,                                               :
                                                        :
                                    Respondent.         :
------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

Petitioner GT Commodities LLC ("GT") filed a petition to compel Respondent IXM S.A. ("IXM") to arbitrate their pricing dispute. IXM filed a cross-petition to enjoin arbitration. For the following reasons, GT's petition is granted, and IXM's cross-petition is denied.

## I.    BACKGROUND

The following facts are taken from the cross-petitions and the parties' other submissions. The facts are undisputed unless otherwise noted.

This action arises out of an aluminum purchase in 2024. GT, the buyer, is a metal trading company with its principal place of business in Connecticut. IXM, the seller, is a Swiss metal marketer and trader. IXM delivered the aluminum to GT, which accepted the delivery. The parties disagree about the purchase price, resulting in GT's claim in the underlying dispute of more than $3 million.

### A.    The Negotiations

In mid-June 2024, the parties first discussed a potential purchase of 45,000 metric tonnes ("mt") of aluminum in three installments. The parties designated the price for each installment with reference to a "Quotational Period" -- in this case, July 2024, October 2024 and January

2025, respectively -- meaning that the price of each installment was determined by the average daily price of aluminum in the designated month.

      The parties resumed their discussions in early August.  On August 2, 2024, Justin Mroz from GT proposed buying from IXM 30,000 mt of aluminum in two 15,000-mt installments with Quotational Periods of October 2024 and January 2025, respectively.  Carlos Taborga from IXM suggested starting in September 2024 instead, and Mroz updated the numbers accordingly.

      On August 5, 2024, Mroz revised GT's bid for the purchase and stated that IXM "[c]an consider [GT's bid] firm for purposes of locking [a] mutually agreed period . . . ."  Taborga replied for IXM that "we can agree to [GT's bid in email]" and that GT's order "is confirmed subject to [Compliance's] approval."  Mroz responded, "Agree on our end" subject to compliance approval, and that he believed "there should be no surprises, as the inputs we used to base contract assumptions" -- including pricing -- "were reviewed mutually and done in [a] transparent way[.]"  On August 13, 2024, Mroz asked whether the "agreement between [GT]/IXM covering purchase of 30kt" -- meaning 30,000 mt -- would become binding upon a third-party's[1] confirmation.  Espinoza from IXM confirmed, "Given [the third-party] has obliged, I guess we are considering the purchase of the 30kmt binding."

## B.    The Contract Confirmation

      On August 19, 2024, Espinoza sent Mroz IXM's document titled Contract Confirmation (the "August Contract Confirmation"), between IXM Trading LLC and GT Commodities, LLC, for the 30,000-mt aluminum purchase.  Espinoza asked Mroz to confirm if the agreement was "workable."  The August Contract Confirmation states:

---

[1] It appears that the third-party was Southwire, which (according to GT), at the same time as the parties' negotiations with each other, was negotiating a deal for GT to step into the shoes of IXM on a sale/purchase commitment that IXM had with Southwire, under a novation of IXM's commitment to sell aluminum to Southwire.

> This CONTRACT CONFIRMATION is entered into between . . . [IXM Trading LLC and GT.]
> . . .
> This contract confirmation incorporates IXM General Terms and Conditions for Refined Metals ("IXM's GTCs") . . . .
> . . .
> Delivery Period[:] 15,000mt shall be shipped within September, 2024. 15,000mt shall be shipped within January, 2025 . . . .
> . . .
> Price[:] The contractual Price shall be the London Metal Exchange ("LME") Aluminum High Grade Cash Settlement quotation on the Quotational Period . . . plus the applicable premium . . . .
>
> Premium[:] The Premium shall be the Midwest transaction premium minus US Cents 3.90 per pound.
>
> Quotational Period ("QP")[:] The QP shall be the average of September 2024, and January 2025, in 15,000mt, respectively[.]
> . . .
> Governing Law and Jurisdiction[:] This Contract is governed by . . . the laws of the state of New York and any controversy of claim arising out of or relating to this Contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association ["AAA"] . . . .  The arbitration shall be held in New York, New York, USA . . . .  Each of the Parties waives any right that it may now or hereafter have to revoke this agreement to arbitrate or to withdraw from any arbitration hereunder before an award has been rendered . . . .

The next day, Mroz responded for GT that the "commercial terms as drafted are agreed for the 30kt.[]"  In connection with this litigation, Mroz submitted a declaration, sworn to on December 10, 2024, stating that his "reference to 'commercial terms' [was] specific to the terms set forth in the Contract Confirmation" which includes an agreement to arbitrate before the AAA. Espinoza replied that IXM would "consider the business . . . as closed / confirmed."

Mroz's also stated in his August 20, 2024, response, "I think we do not have [a] mutually agreed set of GTC's for US business . . . .  Shall we take on a review of GTC's now?  Attached is our standard set.[]"  Espinoza responded, "I'm sure we can trash [sic] out some GTCs but undoubtedly it'll take a few days of back and forward."  Mroz replied that the plan regarding GTCs was reasonable, and "[w]ith regard to other points," GT "can confirm."

IXM's GTCs, which are incorporated by reference in the August Contract Confirmation, contain an arbitration and choice of law provision. IXM's GTCs state that the contract shall be governed by English law and any disputes shall be arbitrated in London, unless IXM Trading LLC is the IXM company that is a party to the contract, in which case the contract shall be governed by New York law and any disputes shall be arbitrated by the American Arbitration Association in New York, New York. IXM Trading LLC is the IXM party named in IXM's August Contract Confirmation. IXM's GTCs further state, "These GTCs are intended to be supplemented by a Contract Confirmation. In the event of conflict, ambiguity or inconsistency between the provisions of the GTCs and the Contract Confirmation, the provisions of the Contract Confirmation shall prevail." As quoted above, IXM's August Contract Confirmation also called for AAA arbitration in New York and application of New York law. GT's GTCs, the "standard set" that Mroz sent Espinoza on August 20, 2024, do not contain a choice of forum or choice of law clause. The parties did not finalize the GTCs.

### C.     Performance

On August 26, 2024, IXM emailed GT, stating that a vessel named Andesborg would carry the September shipment, and loading would be completed between September 23 and 29, 2024. GT confirmed. On September 28, 2024, IXM loaded the first 15,000-mt shipment, and the carrier issued a bill of lading.

On October 1, 2024, IXM issued a provisional invoice for the September shipment. GT responded that the shipment should have been "final priced" because the Quotational Period, September 2024, had passed.

On October 3, Jason Podrats, the Chief Legal Officer of IXM, emailed GT and took the position that the Quotational Period for the first shipment had always been October 2024 and that

the August Contract Confirmation's reference to a September 2024 Quotational Period was "clearly an error," as the "business confirmation" and "commercial calculations and terms [including] premiums due" reference an October 2024 Quotational Period.  Podrats attached "a signed contract from Seller which now correctly sets out the agreed QP of October 2024, for Buyer's countersignature."

Accompanying this email is a revised contract confirmation (the "October Contract Confirmation", and, together with the August Contract Confirmation, the "Contract Confirmations") signed by Podrats.  The October Contract Confirmation is substantially the same as the August Contract Confirmation, except the revised document changes the relevant Quotational Period to October 2024, and the Seller from IXM Trading LLC to IXM S.A.  Both versions contain the same New York choice of law and AAA arbitration provision.  GT never signed either of the Contract Confirmations.

On October 18, 2024, GT commenced AAA arbitration proceedings against IXM pursuant to the arbitration clause in both Contract Confirmations.  IXM argued that the parties had not agreed to arbitrate.  The parties then filed their petitions in this lawsuit to compel and enjoin arbitration, respectively.

## II.    DISCUSSION

GT's petition to compel arbitration is granted and IXM's cross-petition to enjoin arbitration is denied because the parties agreed to arbitrate the underlying pricing dispute.  The parties do not dispute that "the formation and existence of an arbitration agreement must be resolved by the courts in the first instance" rather than the arbitrator.  *Olin Holdings Ltd. v. State of Libya*, 73 F.4th 92, 101 (2d Cir. 2023).  "This is because an agreement that has not been

properly formed is not merely an unenforceable contract; it is not a contract at all.  And if it is not a contract, it cannot serve as the basis for compelling arbitration."  *Id.*

A.    **Subject Matter Jurisdiction**

Although the parties do not dispute the Court's subject matter jurisdiction, it merits a brief discussion because the Court has an independent obligation to ensure that it has subject matter jurisdiction, *see Riley v. Bondi*, 145 S. Ct. 2190, 2201 (2025), and because it is pertinent to the choice of law discussion below.

Section 4 of the Federal Arbitration Act (the "FAA") states that a motion to compel arbitration can be filed in "any United States district court which, save for such [arbitration] agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties . . . ."  9 U.S.C. § 4.  This provision, however, does not independently confer federal jurisdiction.  *Badgerow v. Walters*, 596 U.S. 1, 8 (2022).  "A federal court may entertain an action brought under the FAA only if the action has an independent jurisdictional basis."  *Id.*

Here, the Court has subject matter jurisdiction based on diversity of citizenship.  "Under 28 U.S.C. § 1332(a)(2), district courts have diversity jurisdiction over actions where (1) the matter in controversy exceeds $75,000, exclusive of interest and costs, and (2) the action is between citizens of a state and citizens of a foreign state . . . ."  *Rabinowitz v. Kelman*, 75 F.4th 73, 79 (2d Cir. 2023).  The amount-in-controversy requirement is satisfied because the underlying claim is estimated to be over $3 million.  The diversity requirement is likewise satisfied because the parties to this lawsuit are diverse for the purpose of jurisdiction; GT is a citizen of Connecticut, and IXM is a citizen of Switzerland.  *See* 28 U.S.C. § 1332(a)(2).

B.    **Whether the Parties Agreed to Arbitrate**

"Whether the parties have agreed to arbitrate is generally a question of state contract law." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023). To determine this question, "the court applies ordinary state-law principles that govern the formation of contracts." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 115 (2d Cir. 2025). In this case, as explained below, regardless of which potentially applicable law is applied, the outcome is the same -- the parties formed an agreement to arbitrate. This concludsion follows either from applying New York choice of law principles, which are relevant here, or from foregoing the choice of law analysis, because both New York law and the other potentially applicable law -- the United Nations Convention on Contracts for the International Sale of Goods ("CISG") -- dictate the same outcome.

1.    **Choice of Law**

A federal court exercising diversity jurisdiction, as here, applies the choice-of-law rules of the state in which it sits. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Matter of Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993); *accord Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (New York law). An actual conflict of law exists if "the applicable law from each jurisdiction provides different substantive rules" and the differences "have a significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005)*; Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (summary order). If a conflict exists, the court should then "apply New York choice-of-law rules to decide which jurisdiction's substantive law controls." *Kinsey*, 991 F.3d at 176. "If no actual conflict exists,

and if New York is among the relevant jurisdictions, the court may simply apply New York

law." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012);

*accord CBF Industria De Gusa S/A v. AMCI Holdings, Inc.*, 650 F. Supp. 3d 228, 256 (S.D.N.Y.

2023).

  The potentially applicable laws are the CISG and New York law.  The CISG "governs

sales contracts between parties from different signatory countries" -- including the United States

and Switzerland -- "unless the parties clearly indicate an intent to be bound by an alternative

source of law." *Transmar Commodity Grp. Ltd. v. Cooperativa Agraria Indus. Naranjillo Ltda.*,

721 F. App'x 88, 89 (2d Cir. 2018) (summary order) (citing *Delchi Carrier SpA v. Rotorex

Corp.*, 71 F.3d 1024, 1027 n.1 (2d Cir. 1995)); *accord Nantong Sanhai Garment Co. v. Fab Mill

Inc.*, No. 21 Civ. 859, 2022 WL 540756, at *2 (S.D.N.Y. Feb. 23, 2022); U.N. Comm'n on Int'l

Trade L., *Status: United Nations Convention on Contracts for the International Sale of Goods

(Vienna, 1980) (CISG)*,

https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_goods/cisg/status

[https://perma.cc/XFC6-NUKF] (last visited August 5, 2025) (listing both the United States and

Switzerland as signatories).

  New York law is the other potentially applicable because both Contract Confirmations

state, "This Contract is governed by . . . the laws of the state of New York . . . ."  A contractual

choice-of-law provision, if valid, "clearly indicate[s] [the parties'] intent to be bound by an

alternative source of law." *Transmar Commodity*, 721 F. App'x at 89.

  New York choice of law principles require a determination of whether any differences

between the CISG and New York law "have a significant possible effect on the outcome." *Fin.*

*One Pub. Co.*, 414 F.3d at 331.  As explained below, the parties formed an agreement to arbitrate under both CISG and New York law.

        **2.**        **Application of New York Law**

Under New York law, the parties agreed to arbitrate.  In New York, "[a] binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement." *Wu v. Uber Techs., Inc.*, 260 N.E.3d 1060, 1070 (N.Y. 2024).  "Because contract formation is governed by an objective rather than subjective standard, there is no requirement that a party have correctly understood -- or even reviewed -- the terms presented by the offeror for their manifestation of acceptance to be effective." *Id.*  Instead, an offeree is bound to the contractual terms so long as the "offeree is placed on inquiry notice of" them, such as "when those terms are clearly and conspicuously presented to the offeree as a contract and made available for review." *Id.*

The parties here agreed to arbitrate because their email exchange objectively manifests their mutual assent to IXM's August Contract Confirmation.  IXM's Espinoza stated in the email, "here is a draft contract for the cumulative 30k of CIF vessels sales to you; please would you look [at it] and let me know if workable?"  GT's Mroz responded, "commercial terms as drafted are agreed for the 30kt.[]"  Mroz reserved agreement only to IXM's GTCs incorporated by reference in the August Contract Confirmation and sent GT's GTCs to IXM.  The parties continued to refer to the deal as "closed" and "confirmed," and agreed to work out any disagreement regarding the GTCs.

The arbitration clause is contained in the August Contract Confirmation to which the parties agreed.  The arbitration clause is therefore binding on both parties.  The August Contract Confirmation contains a clause titled "Governing Law and Jurisdiction," which designates New

York law as the applicable law and arbitration as the appropriate forum, all in the same font and print as the other terms of the August Contract Confirmation.  The arbitration provision was "clearly and conspicuously presented to" both parties and put them on actual notice -- far more than "inquiry notice" --  creating a binding agreement to arbitrate.  *Wu*, 260 N.E.3d at 1070. The parties objectively manifested their mutual assent to the terms of the August Contract Confirmation, including its arbitration provision.  IXM drafted and sent the document to GT, and GT expressly agreed to it, reserving only the GTCs.

IXM's argument that the parties' failure to agree on the GTCs negates their agreement fails.  A challenge to the GTCs "does not prevent [the] [C]ourt from enforcing [the] specific agreement to arbitrate" because neither IXM's nor GT's GTCs are inconsistent with, or would affect the validity of, the arbitration agreement.  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).  GT's GTCs do not contain a choice of forum or dispute resolution provision.  IXM's GTCs affirm the arbitration clause in the Contract Confirmations.

### 3.    Application of the CISG

Similarly, the parties agreed to arbitrate under CISG.  IXM made a binding offer, at the latest on August 19, 2024, when it emailed GT the August Contract Confirmation, specifying among other things, the product, quantity, shipment date and delivery location, price, payment terms, governing law and jurisdiction.  IXM's cover email requested GT to advise if the contract is "workable" and, if so, to proceed "and transfer the swaps that [they] talked about last week." Under CISG, a proposal to a specific person for the sale of goods that indicates the goods, quantity and a method for determing the price, and that indicates the intention of the offeror to be bound, is an offer.  *See* CISG art. 14.  "An offer becomes effective when it reaches the offeree." *Id*. art. 15(1).

Under the CISG framework, GT accepted the offer on August 20, 2024, when GT responded by email that the "commercial terms as drafted are agreed for the 30kt.[]"  "A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance" and becomes effective when it reaches the offeror.  *Id*. art. 18(1)-(2).

A contract becomes binding when the offer is accepted.  *Id*. art. 23.  Consequently the parties' agreement became binding -- in CISG parlance, the parties' contract was "concluded" -- on August 20, 2024.  CISG does not require a contract to be signed, as it does not even require a writing or "any other requirement as to form."  *Id*. art. 11.

That the parties did not agree on the GTCs did not undermine their agreement on the terms in the August Contract Confirmation, including the arbitration provision.  GT attached to its acceptance GT's standard GTCs, but the GTCs did not materially change the terms of IXM's offer and therefore did not impair GT's acceptance.  The CISG states that "a reply to an offer which purports to be an acceptance but contains additional or different terms which *do not materially alter* the terms of the offer *constitutes an acceptance*, unless the offeror . . . objects . . . ."  *Id*. art. 19(2) (emphasis added).  "[T]erms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of . . . liability . . . or the settlement of disputes are considered to alter the terms of the offer materially."  *Id*. art 19(3).  GT's standard GTCs did not address any of these terms, all of which were addressed in the August Contract Confirmation, including the arbitration clause for the settlement of disputes.  CISG Advisory Cousel Opinion No. 13(10) states, "Where both parties seek to incorporate standard terms and reach agreement except on those terms, a contract is concluded on the basis of the negotiated terms and any standard terms which are common in substance unless one party clearly indicates in advance, or later on but without undue delay objects to the conclusion of the

contract on that basis." IXM did not make any timely objection to the arbitration provision. It reaffirmed the provision in the October Contract Confirmation after it had made the first shipment of goods and raised the pricing dispute. Only after GT had commenced the AAA arbitration pursuant to the Contract Confirmations did IXM protest that it had not agreed to arbitrate.

### 4.    IXM's Challenge to the Contract as a Whole

IXM argues that there was no contract at all between GT and IXM because they did not agree to price, a material term, and therefore had no contractual agreement to arbitrate. The parties' alleged failure to agree on price is irrelevant to whether the parties agreed to arbitrate. As the Supreme Court explained,

> There are two types of validity challenges [to arbitration agreements] . . . : One type challenges specifically the validity of the agreement to arbitrate, and the other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid . . . . [O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable . . . . Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.

*Rent-A-Ctr.*, 561 U.S. at 70; *see Wu*, 260 N.E.3d at 1072 (applying *Rent-A-Ctr.* to a delegation clause, in which the parties agreed to arbitrate questions including the validity of the arbitration agreement, under New York law). The parties' disagreement now over price concerns the validity and enforceability of the pricing term. That issue is severable and is not relevant to determining whether the parties agreed to arbitrate. *See Rent-A-Ctr.*, 561 U.S. at 70-71; *accord Jones v. Landry's, Inc.*, No. 23 Civ. 9920, 2025 WL 1527307, at *3 & *6-7 (S.D.N.Y. May 29, 2025) (granting defendant's motion to compel arbitration as plaintiff failed to prove the arbitration provision was unenforceable as applied to her).

### C.    Arbitrability of the Underlying Dispute

Having concluded that the parties agreed to arbitrate, the court then "resolve[s] questions of arbitrability -- that is, whether the instant disputes are subject to arbitration . . . . " *Davitashvili*, 131 F.4th at 115. "*First*, we need to determine whether the court or the arbitrator should be the decision-maker on the question of arbitrability." *Id.* "*Second*, if it is for the court to make that determination, we inquire whether the issues are within the scope of the arbitration agreement and if the agreement is enforceable." *Id.*

The underlying dispute over price is subject to arbitration. The arbitration clause in IXM's Contract Confirmation states that "any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association." The clause does not delegate the question of arbitrability to the arbitrator, leaving it for the court to decide. *See Davitashvili*, 131 F.4th at 117 ("[C]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."). The parties dispute the price applicable to their sales transaction. This dispute arises out of and relates to the Contract Confirmations and is within the scope of the arbitration agreement. The agreement is enforceable as IXM raises no other challenge to enforceability except as discussed above.

## III.    CONCLUSION

For the foregoing reasons, GT's petition to compel arbitration is **GRANTED,** and IXM's petition to enjoin arbitration is **DENIED**.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 8 and close the case.

Dated: August 5, 2025
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE